**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SUSAN GALETTE,** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | **NO. 22-2778** |
| **AVENUE 365 LENDING SERVICES LLC** | : | |
| **and NEWREZ, LLC** *also operating as* | : | |
| **CALIBER HOME LOANS and CALIBER** | : | |
| **HOME FUNDING,** | : | |
| *Defendants.* | : | |

## <u>MEMORANDUM OPINION</u>

**Scott, J.**                                                                 **January 23, 2024**

Plaintiff Susan Galette initiated this action against her former employer, Avenue 365 Lending Services, LLC ("Avenue 365"), alleging that in terminating her employment, she was denied a reasonable accommodation to which she was entitled under the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.* ("ADA") and the Pennsylvania Human Relations Act, 43 P. S. §955(a) ("PHRA"); discriminated and retaliated against based upon her disability; and discriminated against based upon her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621 ("ADEA") and the PHRA.

After working remotely in her position as a Funding Specialist for almost two years, Avenue 365 determined that Ms. Galette could not perform all of the essential functions of her job from home.  She contends that its refusal to grant her request for a permanent work-from-home accommodation was discriminatory.

Moving for summary judgment, the defendants, Avenue 365 Lending Services, LLC ("Avenue 365") and Newrez, LLC, also operating as Caliber Home Loans and Caliber Home

Funding ("NewRez") argue that Ms. Galette has failed to show that she was able to perform the essential functions of her job as a Funding Specialist while working remotely, which is fatal to all of her claims based on disability discrimination and age discrimination.

For the reasons that follow, the Court concludes that Ms. Galette cannot sustain any of her claims, and will grant the defendants' motion.

## BACKGROUND

*Factual Background*

Ms. Galette was first hired by Avenue 365 in 2012 as a Funding Specialist. At that time, she was 53 years old. In 2013, she was laid off as part of a reduction in force, and then rehired in 2014 until her termination in April 2022. Throughout her tenure at Avenue 365, she was a Funding Specialist. *See* Defs.' Statement of Undisputed Material Facts (ECF No. 29-1) ("SUF") ¶¶ 2, 7.[1]

Avenue 365 is a title agency that provides title insurance and settlement services to lenders, supporting its customers with refinance and purchase transactions. SUF ¶ 1. Newrez is a mortgage lender and servicer that provided legal, Human Resources, accounting, and IT administrative services to Avenue 365 during relevant times of Ms. Galette's employment, for a fee paid for the services rendered. SUF ¶¶ 4–5; Pl.'s Statement of Undisputed Material Facts (ECF No. 31-1) ("PF") ¶¶ 55–56, 58–59.[2] It served as a liaison between Ms. Galette, Avenue 365, and third party

---

[1] When the Court cites to specific paragraphs in the defendants' SUF, it also refers to Ms. Galette's responses to the corresponding paragraphs. *See* Pl.'s Resp. to the Averments in Defs.' Statement of Undisputed Material Facts (ECF No. 31-5).

[2] When the Court cites to specific paragraphs in the plaintiff's PF, it also refers to the defendants' responses to the corresponding paragraphs. *See* Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts (ECF No. 32-1).

administrators on reasonable accommodation requests. SUF ¶¶ 5, 22–25; PF ¶¶ 51–52.[3]

When Ms. Galette began working at Avenue 365, she, like all Funding Specialists, worked full time in person at its sole Pennsylvania office. SUF ¶ 10.[4] The primary functions of a Funding Specialist included printing, scanning and disbursing checks, releasing wires, facilitating the timely funding of loans, handling files disbursed by third-party partners, handling mail, answering emails, handling phone calls, overnighting checks, booking or posting wires and deposits, and performing wire confirmations. SUF ¶ 7.

The refinance and purchase transactions related to home ownership that Avenue 365 Funding Specialists handle require dealing with very high sums of money in the form of property tax checks, homeowner's insurance, mortgage payoffs, liens, and creditors checks, all of which contain sensitive, nonpublic information. SUF ¶ 8. Due to the large volume of money flowing through accounts on a daily basis, the company is a prime target for wire and check fraud. *Id.*

In March 2020, all Avenue 365 employees began working remotely due to Covid-19 pandemic governmental orders. All Funding Specialists, including Ms. Galette, were provided with a computer tower, monitor, work phone, and scanner to assist them in performing some of their job duties remotely from home. However, during this time, only three employees were given printers and authorized to print out and scan checks related to essential payments that had to be timely handled. SUF ¶¶ 11–12. Because Ms. Galette was not given a printer, she could not print

---

[3] Ms. Galette claims that Newrez was also her employer. Avenue 365 disagrees, contending that Avenue 365 was Ms. Galette's sole employer, and that Newrez should therefore be dismissed as a defendant. Because the Court is dismissing Ms. Galette's claims and granting summary judgment in defendants' favor, it is not necessary to address this claim.

[4] Prior to March 2020, Avenue 365's Pennsylvania office was located in Plymouth Meeting, Pennsylvania. *See* PF ¶ 5. At some point later, its office relocated to Fort Washington, Pennsylvania. Avenue 365's office is currently located in Langhorne, Pennsylvania. PF ¶ 45.

checks and deposits while working remotely.

In June 2020, Galette was admitted to the hospital and diagnosed with Chronic Obstructive Pulmonary Disease ("COPD") and emphysema. Her hospitalization was brief, but she obtained a medical accommodation from her employer for her COPD. SUF ¶ 15.

In July 2020, Avenue 365 required all Funding Specialists to return to work in the office, unless the employee had obtained a medical accommodation or moved far away from Avenue 365's Pennsylvania office. Ms. Galette was permitted to continue to work remotely because she had obtained a medical accommodation for her COPD. SUF ¶¶ 13, 15. However, her duties as a remote worker were curtailed because the company changed its policies once the Funding Specialists returned to the office. Specifically, in order to protect the privacy of customers (as the checks contained nonpublic personal information), keep the funding process efficient, and mitigate the risk of financial fraud, checks were no longer permitted to be scanned or printed remotely after July 7, 2020 by anyone in Avenue 365's Funding Department. Nor were remote workers allowed to mail checks and/or other materials, release wires for all files, book deposits, or receive and handle return checks and mail. SUF ¶ 14; PF ¶ 19.

In October 2020, Ms. Galette had surgery to remove a cancerous mass from her kidney, and she received kidney treatment for three months. PF ¶ 29. She was granted short term disability leave from October through November for her kidney condition. SUF ¶ 15. In November 2020, Ms. Galette was cleared to return to work. Because of her COPD, she was permitted to continue to work remotely. SUF ¶ 15. As a result of her COPD, Ms. Galette struggles to breathe, has an elevated heart rate and gets exhausted by walking. Additionally, environmental factors such as perfumes and other irritants can exacerbate her condition. PF ¶¶ 26–27. Further, she is required to use oxygen, and four times per day she needs to use an albuterol nebulizer for breathing

treatments that go directly into the lungs. PF ¶¶ 35–36. She cannot walk more than ten feet at any given time, and her COPD is slowly getting worse over time. PF ¶¶ 38, 41.

Although Ms. Galette had no lasting medical problems from the kidney cancer, the COPD and kidney surgery compromised her immune system. This places her at increased risk of serious complications from COVID-19, necessitating that she wear a mask when around other people, including in the office. However, because of her COPD, wearing a mask makes it difficult for her to breathe. PF ¶ 21.

In February 2021, Avenue 365 offered a work-from-home hybrid rotation experiment to the Funding Department in order to retain staff and placate the Funding Specialists' preference to work from home periodically. SUF ¶ 16. However, Avenue 365 ended this rotation in May 2021, requiring Funding Specialists to return to the office full time by July 2021. It contends that the need to be physically in the office to coordinate the high volume of funding requests, print and disburse checks, and handle an increased volume of critical mail containing crucial items related to homeownership (like property tax checks, mortgage payoffs, liens, and creditor checks that can accrue interest daily), made remote work rotation inefficient. SUF ¶ 17. Ms. Galette was not required to come on-site at all during the February through May 2021 hybrid remote work rotation experiment due to her medical condition. SUF ¶ 17.

Avenue 365 allowed only one other individual, other than Ms. Galette, to continue to work remotely after July 2020. That individual was Ms. Drew Pollack, who was 60 years old at the time. Prior to March 2020, Ms. Pollack was the Team Lead and Senior Funding Specialist for the Funding Department. Because she was a high performer, Ms. Pollack was selected as one of the three Funding Department employees to continue printing designated essential payments during the three-month pandemic-related remote period, for which she was provided a laptop, monitors,

keyboard, mouse, and docking station, as well as a printer. She requested to continue to work remotely because she moved to Florida during the pandemic. Avenue 365 contends that it "reluctantly" permitted her to continue working remotely past the July 2020 return-to-office date because she provided unique and essential services that no other employees at Avenue 365 could provide, such as handling complex escrow reconciliations, and being a licensed title producer in Maryland, which is required by the state to release wires for Maryland properties. This unique skill set and services rendered Pollack an exceptional case, and she was considered "indispensable." However, when she was approved to work remotely after July 2020, she was transitioned to a different position in the Funding Department, losing her title as Team Lead. Further, she was no longer permitted to handle functions traditionally performed in the office that her previous position required, such as printing and disbursing checks and handling mail. SUF ¶¶ 66–70; PF ¶¶ 124–25.

Because all Funding Specialists were required to return to the office full time by July 2021, Ms. Galette was informed in June that she would need to either return to the office or provide updated medical certification to support her continued need to work remotely. Ms. Galette and her treating physician submitted a request for her to work from home and for intermittent leave for pulmonologist and other doctor appointments.

During this time period in mid-2021, Avenue 365 was handling an extraordinarily high volume of business as a result of an unexpected market boom in the financial industry. This created a need to quickly hire additional staff, but the company could not hire enough local Funding Specialists to come on-site to keep up with consumer demand. Although Avenue 365 believed that Ms. Galette could not complete the essential functions of the in-office role while working remotely, it determined that having her perform a modified role would be beneficial to the

company.  Consequently, it approved Ms. Galette's request to continue working remotely from July through December of 2021.  During this time, her job duties were limited to phone calls, emails, and attorney wires, and she was excused from performing a significant number of the essential functions of the Funding Specialist position, including printing and disbursing checks, handling mail, and booking and posting wires and deposits.  SUF ¶¶ 19–20, 28–30.

To address the difficulty in finding enough local talent to support the Funding Department in its Pennsylvania office, Avenue 365 created several new remote Funding Specialist positions. It contends that these roles were intended to be temporary, with the long-term goal of requiring all of the remote Funding Specialists to return to the office.  These remote Funding Specialists did not work with physical check stock (printing, scanning, disbursing), sensitive nonpublic information, or returned checks and mail from various sources that needed to be reconciled and adjustments made to satisfy lender requirements.  SUF ¶ 29.

As comparators, Ms. Galette identifies two Funding Specialists who were hired in mid-2021 to work exclusively from home, but who did not request a medical accommodation and who were younger than her.  SUF ¶ 18; PF ¶¶ 129, 135.  One employee was Fonda Aguwa,[5] who was hired on March 1, 2021 at age 34.  SUF ¶ 71; PF ¶¶ 129, 140.  Ms. Aguwa was located in Michigan and continued to work in her fully remote position as a Funding Specialist until November 3, 2022, when she was part of a reduction in workforce.  SUF ¶ 71; PF ¶¶ 134, 140.  The other employee was Tiffany Lastinger, who was hired as a remote Funding Specialist on April 5, 2021.  PF ¶ 129. Ms. Lastinger left the company by choice on October 15, 2021.

In late 2021 and into 2022, the financial market as a whole slowed drastically from the spike that had occurred throughout the majority of 2021.  Consequently, Avenue 365 ceased hiring

---

[5] Ms. Galette misspells Ms. Aguwa's name as "Aguada."

temporary remote workers and required those temporary remote hires who lived within a reasonable geographic proximity to the office to report to the office.  Additionally, Avenue 365 did not hire any new employees for the Funding Department after November 2021.  Throughout 2022, Avenue 365 implemented a company-wide hiring freeze and conducted several rounds of reductions in force.  SUF ¶¶ 33-35.

In December 2021, Ms. Galette's supervisor, Shawna Sorenson, completed another analysis regarding her continued remote status.  She concluded once again that Ms. Galette's requested accommodation to work remotely prevented her from completing all of the functions of her job position, including the ability to release wires, print and disburse checks, handle mail, and deposit checks.  SUF ¶ 32.  In early January 2022, Ms. Galette submitted a request to extend her workplace accommodation to work remotely and for intermittent leave for medical appointments.  This time, however, she requested a permanent work-from-home accommodation.  SUF ¶¶ 37–39.

Avenue 365 determined that Ms. Galette's request was unreasonable and constituted an undue hardship, and that it could not accommodate her demand for a permanent, lifelong remote accommodation.  It did offer Ms. Galette several options for in-office accommodations, including providing her with: a handicapped parking spot located near the office so that she would not have to walk far; and a private office to provide space for her oxygen tanks and to allow her to maintain distance from coworkers due to her concerns about vulnerability to COVID-19 transmission.  On March 2, 2022, Avenue 365 informed her of its decision to deny her request for a permanent extension to work remotely.  She was told that she would be terminated from her position unless she returned to the office by April 1, 2022 or applied for (and got hired for) another remote position within the company.  SUF ¶ 45.

Although Ms. Galette disputes that Avenue 365 offered her parking close to the office, she

admits that this would not have accommodated her doctors' restrictions because she would not have been able to walk the distance to the front door of the office, walk into the office, or move around within the office to print checks and do other tasks. Additionally, even with a private office, she would not have been able to store her oxygen tanks there. SUF ¶ 45.

On March 28, 2022, Ms. Galette provided a letter from her doctor, stating that: "It is best for Ms. Galette to work from home on a permanent basis" due to a "multitude of severely debilitating conditions" including COPD, arthritis, and cervicalgia (neck pain). On April 1, 2022, she submitted another letter from a different treating physician, stating that she was unable to "walk more than 100 meters" and would need a "lifelong" accommodation of working from home. Neither letter contained any new medical information or a different recommendation from what her doctors had previously recommended. SUF ¶¶ 48–51.

Ms. Galette did not come to the office on April 1, 2022. As a result, she was terminated on April 12, 2022. SUF ¶ 55. At that time, she was 63 years old. Avenue 365 did not hire anyone to replace Ms. Galette, and her duties were assumed by other in-office personnel. SUF ¶ 60.

*Ms. Galette's Claims*

Ms. Galette brings four types of claims under the ADA and the PHRA based on her termination from employment. First, she claims that she was discriminated against based upon her disability. Second, she contends that she was treated less favorably than other similarly situated employees who were not disabled. Third, she claims that she was denied a reasonable accommodation to which she was entitled. Lastly, she claims she was retaliated against based on her request for a reasonable permanent accommodation.

With respect to her age discrimination claim brought under the ADEA and PHRA, Ms.

Galette claims that Avenue 65 treated her differently than substantially younger employees because of her age. She bases her claim on the fact that other substantially younger employees remained employed when Ms. Galette was terminated, and they performed her duties.

## DISCUSSION

*Standard of Review*

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 151 (3d Cir. 2017) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "[O]nly evidence sufficient to convince a reasonable factfinder" merits consideration at this stage. *Fowler v. AT & T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary

judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

In considering the motion, we draw all reasonable inferences in the nonmovant's favor. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022). Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts and the weighing of evidence are matters left to the jury. *Anderson*, 477 U.S. at 255.

*McDonnell Douglas Standard*

Ms. Galette brings claims under both the ADA and the ADEA. Because she does not present "direct evidence" of discrimination and is proceeding under a pretext theory, each of her claims is governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fowler*, 19 F.4th at 298 (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 668-69 (3d Cir. 1999) (as to ADA claim)[6]; and *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995) (as to ADEA claim)).

Ms. Galette must first establish a *prima facie* case of discrimination. *See Fowler*, 19 F.4th at 299; *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (citations omitted); *Capps*, 847 F.3d at 151–52, 156 n.12. If she fails to establish a *prima facie* case, the defendants are entitled to judgment as a matter of law.

---

[6] All of Ms. Galette's claims brought under the ADA -- for disability discrimination, failure to accommodate, disparate treatment, and retaliation -- are subject to the *McDonnell Douglas* analysis. *See Capps,* 847 F.3d at 156 n.12.

If she succeeds in establishing a *prima facie* case creating an inference of discrimination, the burden shifts to the defendants to "'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Willis v. UPMC Children's Hosp. of Pitts.*, 808 F.3d 638, 644 (3d Cir. 2015) (quoting *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 412 (3d Cir. 1999)) (further citations omitted). The defendants' burden is "relatively light." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). They can satisfy their burden by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The burden is one of production, not of persuasion. *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). It is not necessary to prove that the proffered reason actually motivated its decision. *Fuentes*, 32 F.3d at 763. They need only show that the decision could have been motivated by the proffered legitimate, non-discriminatory reason. *Id.*; *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

If the defendants satisfy their burden, Ms. Galette must then produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination. *Willis*, 808 F.3d at 644 (citing *Burton*, 707 F.3d at 426–27). She may discredit the proffered reason by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." *Id.* at 644–45 (citing *Fuentes*, 32 F.3d at 765). Another way to show pretext is by producing evidence from which a factfinder could conclude that the adverse employment action was more likely than not the result of discrimination. *Willis*, 808 F.3d at 645 (citing *Fuentes*, 32 F.3d at 764). In other words, Ms. Galette must offer "evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's

articulated legitimate reasons . . . or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *In re Trib. Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018) (quoting *Fuentes*, 32 F.3d at 764); *Willis*, 808 F.3d at 644–45. The final burden of production "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981).

*Standard for ADA Claims*[7]

## Disability Discrimination

To make out a *prima facie* case of disability discrimination, a plaintiff must show that she: (1) is "disabled" within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) suffered an adverse employment decision because of discrimination based on her disability. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). A disabled employee may establish a *prima facie* case under the ADA if she shows that she can perform the essential function of the job with a reasonable accommodation and that the employer refused to make such an accommodation. *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001).

A two-part test is used to determine whether a plaintiff is "otherwise qualified" for the job. *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, App. at 353-354). First, the plaintiff must "satisf[y] the prerequisites for the position, such as possessing the

---

[7] The PHRA and the ADA are "basically the same . . . in relevant respects, and Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts." *Buskirk v. Apollo Metals,* 307 F.3d 160, 166 n.1 (3d Cir. 2002) (quoting *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)). Therefore, the Court will consider Ms. Galette's ADA and PHRA claims collectively.

appropriate educational background, employment experience, skills, licenses, etc." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999) (quoting *Gaul*, 134 F.3d at 580). Second, the plaintiff must be able to "perform the essential functions of the position held or desired, with or without reasonable accommodation." *Gaul*, 134 F.3d at 580 (citation omitted).

In determining "essential functions" of the job, the ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

The burden is on the plaintiff to prove that she is an "otherwise qualified" individual, and she must "demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job." *Taylor*, 184 F.3d at 320.

Disparate Treatment Claim

Galette also claims that the defendants treated her differently than other similarly situated employees who were not disabled. To establish a *prima facie* case of disparate treatment under the ADA, a plaintiff must make the same showing that is required for a disability discrimination claim.

Failure to Accommodate Claim

To establish a *prima facie* case on a failure-to-accommodate claim, the plaintiff must establish: "(1) [s]he was disabled and [her] employer knew it; (2) [s]he requested an accommodation or assistance; (3) h[er] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated." *Capps*, 847 F.3d at 157 (citation omitted); *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 192 (3d Cir. 2009) (citing *Williams*, 380 F.3d

at 771 ("[A] failure to make a reasonable accommodation for a disabled and qualified employee constitutes discrimination under the ADA.")). "Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (citing *Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 772 (3d Cir. 2004)).

However, the ADA does not require an employer to create a new position to accommodate an employee with a disability. *Buskirk,* 307 F.3d at 169 (citation omitted). *See also Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000) ("employers are not required to modify the essential functions of a job in order to accommodate an employee").

Retaliation Claim

To establish a *prima facie* claim for retaliation under the ADA, a plaintiff must provide evidence that (1) she engaged in a "protected activity," (2) she suffered an adverse action after or contemporaneous with the protected activity, and (3) there is a causal connection between the protected activity and the adverse action. *Fogleman v. Mercy Hosp. Inc.,* 283 F.3d 561, 567–68 (3d Cir. 2002) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

Once the plaintiff establishes a *prima facie* case for any of these ADA claims, the second step of the *McDonnell Douglas* framework kicks in. At this point, the defendants must "'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Willis*, 808 F.3d at 644. If the defendants meet that burden, it shifts back to Ms. Galette, who must then produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination.

*Ms. Galette Fails to Make Out a* <u>Prima Facie</u> *Case on Any of Her ADA Claims*

Avenue 365 does not contest that Ms. Galette is disabled or that she suffered an adverse employment action.  It also concedes that Ms. Galette possesses the appropriate educational background, experience and skills to perform her job when she is in the office.  The only dispute is whether she is "otherwise qualified" to perform the "essential functions" of her job as a Funding Specialist, with or without reasonable accommodations.

Ms. Galette admits that her sole and exclusive request for an accommodation after January 2022 was to work from home on a permanent, "lifelong" basis.  She testified that there was nothing Avenue 365 could have done to accommodate her in any way to return to the office, full or part time, including any office modifications.  SUF ¶ 63.  Avenue 365 thus argues that because some of the essential tasks of Ms. Galette's position as a Funding Specialist required her presence in the office, and she cannot physically come into the office to work, she is unable to show that she is a "qualified individual" under the ADA.  Without meeting that requirement, it contends, Ms. Galette cannot make out a *prima facie* case for any of her claims under the ADA.

Specifically, Avenue 365 proffers that the primary, essential functions of a Funding Specialist include printing, scanning and disbursing checks, releasing wires, facilitating the timely funding of loans, handling files disbursed by third-party partners, overnighting checks, booking or posting wires and deposits, handling mail, answering emails, making phone calls, and handling attorney wires.  It notes that by 2021, the only functions that Ms. Galette -- or any remote worker -- was permitted to do while working from home were the last three on this list: answering emails, making phone calls, and handling attorney wires.

In response, Ms. Galette contends that she is a "qualified individual" under the ADA and has made out a *prima facie* case for her ADA claims.  She states that the only essential functions

that Avenue 365 claims she could not perform were "limited to the need to print and mail checks, book deposits, receive returned checks, and mail." Pl.'s Opp'n to Defs.' Mot. for Summ. J. (ECF No. 31) ("Pl.'s Br.") at 16. She notes that she spent most of her time working on attorney files, which did not require check printing. She argues that because printing and mailing checks were "largely not part of her" job duties, she could (and did) perform the essential functions of her job while working from home. *Id.* at 2, 16. She also contends that Avenue 365's argument is "directly undermined by the fact that [she] successfully performed the job remotely for two years." *Id.* at 16. In addition, she argues that it would have been a reasonable accommodation to have given her a printer, as that would have allowed her "to perform the alleged essential functions that she was not performing." *Id.* at 17.

The Court concludes that Ms. Galette has failed to establish a *prima facie* case on any of her claims brought under the ADA. With respect to her ADA claims for disability discrimination, disparate treatment and failure to accommodate, they do not survive summary judgment because they require that she is able to perform the essential functions of her job. As explained below, Ms. Galette has not met her burden to produce evidence demonstrating that a reasonable accommodation would have allowed her to perform the essential functions of her job.

Avenue 365 proffered a long list of job duties of a Funding Specialist, only three of which it considers to be appropriate to be performed at an employee's home. It put forth uncontested evidence showing that allowing Funding Specialists to perform most of their job functions remotely posed too much of a fraud and security risk. It explained that Funding Specialists handle transactions involving high sums of money in the form of property tax checks and creditors' checks, making their work vulnerable to wire and check fraud. These checks also contain sensitive, private information. Thus, once the Funding Specialists returned to the office in July 2020 (after

17

all employees had been sent home in March due to the COVID-19 pandemic), in order to mitigate the risk of financial fraud and to protect the privacy of customers' personal information, Avenue 365 determined that checks were no longer permitted to be scanned or printed remotely by anyone in Avenue 365's Funding Department, nor were remote workers allowed to mail checks and/or other materials, release wires for all files, book deposits, or receive and handle return checks and mail. Additionally, Avenue 365 determined that in order to keep the funding process running efficiently, it needed Funding Specialists to be physically in the office to coordinate a high volume of funding requests, print and disburse checks, and handle an increased volume of time sensitive mail.

Ms. Galette does not put forth evidence showing how any of these job duties are not essential or not required to be performed on site. Instead, she responds by stating that because she spent most of her time working on attorney files, which did not require check printing, and the "only essential function" she allegedly could not perform were at home was printing and mailing checks, book deposits, receive returned checks, and mail," she therefore "was performing the essential functions of her job when she worked on attorney files." She also emphasizes how well she performed the job duties she was assigned while working remotely.

Ms. Galette is effectively asking Avenue 365 to accommodate her by permanently removing essential functions of her position and/or reallocating them to other employees. But the ADA does not require employers to accommodate a disabled employee by permanently reassigning essential functions to in-office employees, forcing those employees to take on additional tasks. *See Gardner v. SEPTA*, 410 F. Supp. 3d 723, 741 (E.D. Pa. 2019), *aff'd*, 824 F. App'x 100 (3d Cir. 2020) ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job."); *Donahue*, 224 F.3d at 232 (a request that another employee "cover" or perform duties for the plaintiff is a request to be exempted from an essential duty, not an

accommodation designed to help the plaintiff perform an essential duty of the job).  Nor is Avenue 365 required to modify the essential functions of a job to accommodate an employee with a disability.  *See Donahue*, 224 F.3d at 232.  Finally, the fact that Ms. Galette adequately performed some of her essential job duties does not excuse her from performing all of her essential job functions.  Avenue 365 did not terminate her because she was performing her assigned remote tasks inadequately, but rather because she would not come into the office to perform other essential tasks.  In short, a plaintiff does not get to pick and choose the preferred job duties that she can perform as proof that she was a qualified person with a disability under the ADA.

Under the ADA, the court is required to consider "the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 12111(8).  Here, Avenue 365 has provided sound reasons for what it deems are the essential functions of a Funding Specialist, as well as which of these functions had to be completed in the office.  Ms. Galette proffers no evidence to refute Avenue 365's determination of the essential functions of the position and how and where they needed to be performed.  Thus, the Court finds that Ms. Galette could not perform the essential functions of her job when working remotely.

The Court finds that Ms. Galette has not met her burden to produce evidence demonstrating that a reasonable accommodation would have allowed her to perform the essential functions of her job as a Funding Specialist.  Thus, because her ADA claims for disability discrimination, disparate treatment and failure to accommodate require that she is able to perform the essential functions of her job, she has failed to make out a *prima facie* case on those three claims.

Nor has Ms. Galette made out a *prima facie* claim for ADA retaliation.  As stated above, she must establish that she engaged in a "protected activity," and that there is a causal connection between the protected activity and her firing.

Ms. Galette contends that she engaged in protected activity when she made her renewed

request to work from home in January 2022, and that Avenue 365 retaliated against her for requesting that reasonable accommodation.  She argues there is a causal connection between the protected activity and her termination because Avenue 365 rejected her request for a reasonable accommodation and fired her soon after it learned that she required the remote-work accommodation to be permanent.  She also argues that Avenue 365 "terminated [her] employment based upon the bogus premise that she needed to be in the office, when there were at least three other employees performing the same job from home at least two of whom were continued to work from home when Galette was terminated." Pl.'s Br. at 18.

Ms. Galette's sole reliance on purported temporal proximity between her "renewed request" for an accommodation in early 2022 and her termination in April 2022 is not evidence of retaliation. Avenue 365 made the decision to terminate her *three months after* she made her request to work remotely on a permanent basis.  That is hardly close in time.  Further, it accommodated her many requests to work fully remotely for nearly two years, and only decided to terminate her after making many attempts to provide her with alternatives, such as offering her a parking space and a private office, to accommodate her disability.  Therefore, without a causal connection between the protected activity and her firing, she has not stated a *prima facie* case for ADA retaliation.

*Ms. Galette Fails to Demonstrate Pretext on Her ADA Claims*

Even if we agreed with Ms. Galette that she could perform the "essential functions" of her job, all of her ADA claims nonetheless fail under the third step of the *McDonnell Douglas* analysis. Under that step, she must proffer evidence that Avenue 365's legitimate, nondiscriminatory reasons for firing her were a pretext to discriminate against her.

Ms. Galette concedes that in "a complete vacuum, Defendants have offered a legitimate nondiscriminatory reason" for her termination -- that she could not perform the essential functions

20

of her job. Pl.'s Br. at 17. She argues, however, that "the record contains substantial evidence of pretext," including that she performed the job working at home for nearly two years; any function of the job that she was not performing "could have easily been accomplished with a company supplied printer;" and there were at least three other employees who performed the same job working at home, at least two of whom were employed when she was terminated. Further, she argues that the fact that at least three other employees performed those same duties remotely establishes that the alleged "essential functions" were not actually *essential*. *Id.*

Ms. Galette has not put forth any evidence that would discredit the reasons Avenue 365 has given for denying her request for a permanent accommodation to work from home, or that would lead a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of her termination.

With respect to her contention that Avenue 365 could have provided her with a printer so that she could perform all of the job functions at issue, Ms. Galette has failed to rebut Avenue 365's business reasons for no longer permitting any employee to print and scan checks remotely. As explained *supra*, due to concerns about the risk of financial fraud, to protect the privacy of customers' personal information, and to keep the funding process running efficiently, Avenue 365 determined that the essential functions of printing, scanning and disbursing checks, releasing wires, facilitating the timely funding of loans, handling files disbursed by third-party partners, overnighting checks, booking or posting wires and deposits and handling mail had to be performed in the office. Additionally, even if Avenue 365 had been willing to provide Ms. Galette with a printer, she still would have been unable to perform the many remaining essential functions that must be done on-site that cannot be accomplished at home with the use of a printer.

Ms. Galette likewise fails to rebut Avenue 365's legitimate reasons for allowing Ms.

Pollack, Ms. Lastinger and Ms. Aguwa to work remotely. She argues that because these three employees were allowed to work remotely, and none requested a medical accommodation, this is evidence that Avenue 365's proffered reason for denying her request for a permanent remote work accommodation was merely a pretext to discriminate against her on the basis of her disability. But these three employees were not similarly situated to her.

Like Ms. Galette, Ms. Pollack worked for Avenue 365 prior to the pandemic, and then worked remotely for Avenue 365 after the pandemic. However, unlike the plaintiff, Ms. Pollack was a previous Team Lead, a Senior Funding Specialist, and had moved out-of-state during the pandemic. She had a unique skill set and work experience that neither Ms. Galette nor any other Funding Department employee, remote or onsite, could fill. Pollack's valuable, unique qualities render her objectively and sufficiently different to Plaintiff and therefore not a relevant, similarly situated comparator.

Ms. Lastinger left the company by choice on October 15, 2021, five months before Ms. Galette was terminated. Thus, she is not a proper comparator. This leaves only Ms. Aguwa, who is also not a proper comparator. Ms. Aguwa was hired as a temporary employee with modified job duties in 2021, in response to market pressures that existed at that time. These remote positions had different job functions from other Funding Specialists hired on-site because they could not perform and were never expected to perform essential in-office positions when they were hired. This is different from Ms. Galette's situation, who when hired, was expected to, and did in fact perform, essential job functions on-site. Additionally, Avenue 365 ceased hiring temporary remote workers in 2022 and required those temporary remote hires who lived within a reasonable geographic proximity to the office to report to the office. Since Ms. Aguwa lived in Michigan, she was allowed to continue working remotely. Further, Avenue 365 did not hire any new employees

for the Funding Department after November 2021, and throughout 2022, it implemented a company-wide hiring freeze and conducted several rounds of reductions in force. This included Ms. Aguwa, who was laid off on November 3, 2022. Thus, Ms. Galette has failed to meet her burden to show that any similarly situated comparator was treated more favorably than her.

Therefore, because the Court has found that Avenue 365 has demonstrated the existence of a legitimate, non-retaliatory reason for its adverse employment decision, and Ms. Galette has presented no evidence that its explanation was pretextual or that the decision was retaliatory, Ms. Galette's ADA claims fail under the third step of the *McDonnell Douglas* analysis.


*Standard for ADEA Claim*[8]

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The plaintiff must show that "but for" her age, the defendant would not have taken the adverse employment action in question. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009).

As with claims brought under the ADA, at the summary judgment phase, the *McDonnell Douglas* framework applies to an ADEA claim. First, an age-discrimination plaintiff must make out a *prima facie* case and show that she: (1) is over forty years old; (2) suffered an adverse employment decision; (3) was qualified for her position; and (4) was ultimately replaced by another employee "who was sufficiently younger so as to support an inference of a discriminatory

---

[8] The Third Circuit has held that the same legal analysis applies to claims under the ADEA and the analogous provision of the PHRA. *Willis*, 808 F.3d at 643. Therefore, the Court addresses Galette's ADEA and PHRA claims collectively.

motive." *Martinez*, 986 F.3d at 266 (quoting *Willis*, 808 F.3d at 644).

Where the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on" age considerations. *Willis*, 808 F.3d at 644 (citation omitted). For example, a plaintiff may establish the fourth element with proof that, during a reduction in force, sufficiently younger employees were retained when the plaintiff was fired. *Fowler*, 19 F.4th at 299 (citation omitted); *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234-36 (3d Cir. 1999) (noting that while there is no "particular age difference that must be shown . . . courts have held that a five year difference can be sufficient, [and] a one year difference cannot" to create an inference that an employment decision was based on age) (citations and internal alterations omitted).

*Ms. Galette Fails to Make Out a* <u>Prima Facie</u> *Case on Her ADEA Claim*

Ms. Galette contends that she has established a *prima facie* case for age discrimination because three other "substantially younger employees" (ages 26, 27, and 53), who were not working remotely at the time of her termination, and Ms. Aguwa (age 34), who was working remotely at that time, remained employed in the Funding department. In essence, Ms. Galette argues that because younger employees, who were hired long before her termination, remained employed in the Funding department after her termination, this is evidence that her age was "the reason" that she was terminated. This claim fails for several reasons.

First, for the same reasons the Court found that Ms. Galette was not qualified to perform the essential functions of the Funding Specialist job in the context of her ADA claims, she likewise cannot satisfy the third element of an ADEA *prima facie* claim -- that she was qualified for her position.

24

Second, Ms. Galette is unable to show that "but for" her age, Avenue 365 would not have terminated her. Avenue 365 hired no new employees in the Funding department between November 2021 and December 2022, and conducted layoffs in 2022. Thus, Ms. Galette has no evidence that she was replaced by a younger worker. Nor does she have evidence that anyone from outside of Avenue 365's existing Funding Department took over her job responsibilities. Thus, she is unable to show that Avenue 365 treated similarly situated, substantially younger individuals more favorably than her.

In short, Ms. Galette has failed to establish a causal connection between her age and Avenue 365's decision to terminate her. Therefore, she has not stated a *prima facie* claim for age discrimination.

## CONCLUSION

Because Ms. Galette has failed to put forth sufficient evidence showing that she is able to perform the essential functions of her job as a Funding Specialist while working remotely, she has not made out a *prima facie* case of disability discrimination or age discrimination. Even if she had stated a *prima facie* case, Ms. Galette has not mustered sufficient evidence discrediting Avenue 365's legitimate, nondiscriminatory reasons for terminating her to show that they were a pretext to discriminate against her on the basis of her disability or age. Therefore, the Court grants the defendants' motion for summary judgment.

**BY THE COURT:**

**HON. KAI N. SCOTT**
**United States District Court Judge**

25